Before I talk about Ms. Alexander's case, I would like to make a correction. As the court is aware, I had four cases today, and in the most recent case I argued, the Bakewell case, I said that the migraines were under control as of somewhere between February and June of 2005. That's this case. So please strike that from the Court's consideration in the Bakewell case. Anyhow, this case involves kind of an unusual situation, because it's the second time that the case has been on appeal to court. The first time it was on appeal, the ALJ had made an express finding that the claimant has fibromyalgia. Judge Hogan upheld that finding, found no reason to tinker with it. Judge Hogan also held that the ALJ had improperly rejected five different doctors' opinions. He remanded for the purpose of clarifying whether those doctors' opinions resulted in a finding of disability, because they hadn't did the functional assessments. They'd said such things like, you know, she's debilitated and totally incapacitated, things like that. But they hadn't quantified it in terms of what we call RFC, residual functional capacity. And so Judge Hogan's remanded. Would you educate me, counsel, on fibromyalgia? This was a diagnosis seven years old. Is fibromyalgia curable, or once the diagnosis is made, does it continue forever? There is no known cure. There are some patients who have fibromyalgia who do recover, but nobody knows why. I'm trying to assess that this is a seven-year-old diagnosis, and what relevance that might have. And I didn't, I'm absolutely ignorant about the disease itself. Well, it's maybe a strategic error on my part, but most of the discussion of the fibromyalgia in this case appears in my statement of the facts, because I'm arguing that one of the errors that the ALJ committed was in refusing to comply with Judge Hogan's order. And so the argument section of my brief focuses extensively on that, whereas all the discussion of the fibromyalgia itself and what the doctor said about it, that's all in the facts section of my brief. So in other words, you read Judge Hogan's original order as taking the fibromyalgia issue off the table on the remand, because he determines that she had it, and that's the end of that. So that, is that what you're saying? No. I'm, you know, I wouldn't go quite that far. I, see, Judge Hogan didn't actually, you know, consider arguments pro and con for the fibromyalgia. He simply noted that Judge Kingrey had already agreed that the claimant had fibromyalgia. On remand, if Judge Kingrey had come up with legitimate reasons based on new evidence to change that finding, then I'm not so sure I could contest that. But what happened here is that she came up with improper reasons to change her mind. Well, her main reasons were that she'd never really been properly diagnosed, and in fact, it was an earlier diagnosis. She has a very clear diagnosis by Dr. Emery all the way back to 1989. And everybody else was presumably working off that, essentially. Yes, I believe that's correct. But nobody ever disagreed with it. Nobody undiagnosed her once she was diagnosed back in 1989. So she's had this progressively worsening fibromyalgia, which then when it went back on remand to Judge Kingrey, she goes outside the medical record and says, oh, well, I changed my mind. She doesn't have fibromyalgia after all. Well, that's contrary to what the doctors are saying. Outside the record? She just may disregard a part of the record, but what do you mean by outside the record? Well, what Judge Kingrey did is she went to the DSM-IV, and she relied on this resident-in-training Dr. Cowder, who conducted some testing. And Judge Kingrey says, well, this doctor's test results, based on my extra-record research, establish that this person is malingering. She went outside the record to make that determination. She went to the DSM-IV. Well, the problem with that is that Judge Kingrey isn't a medical expert, and lay intuitions about medical phenomena and lay readings of medical texts can often be wrong. And here she was wrong, because even Dr. Cowder didn't diagnose malingering. But the bottom line that you haven't addressed at all is this pain drug-seeking behavior, which seems to undermine the entire credibility finding. In other words, he's essentially saying she just isn't credible about anything she's saying, because she has this other motive, which is going to doctors who fire her and put her on pain medication, and she's trying to get medication for ulterior reasons, and therefore essentially none of her reports of pain or anything else can be credited. Right. Well, Judge Kingrey says that one of the reasons that she doesn't believe in fibromyalgia is that the treating physicians are not following accepted medical practice, which is that opiates should never be used to treat fibromyalgia. Well, that's just plain wrong, as Dr. That's what I'm referring to. I mean, my understanding of what she is essentially saying is she doesn't deal with the older diagnosis, but even that diagnosis is still based on reports of subjective pain, right? Yes. And she is basically saying that after, at least from this point, when it may have been true then, you can look and see that her whole pattern of behavior is to feign pain of various kinds in order to get medication, and she's been going to emergency rooms and going to different doctors, and she's been put on pain medication contracts, and she's been violating them, and so essentially I don't believe anything she says about pain. Well, interestingly enough, Your Honor, I think the portrayal that you just gave isn't the one that the record portrays, because Dr. I'm trying to characterize the ALJs. Oh, yeah, that's an excellent characterization of what the ALJ gave, but that's not what the record shows. Dr. Pearson did the psychological testing and said that she was not a malingerer and that she was not embellishing symptoms. Dr. Gerber, who was prescribing the narcotics, expressly stated that she should be on scheduled substances, in this case opiates. That's what he's referring to. And the ALJ goes and relies on her lay, quote-unquote, expertise and decides that all these doctors are wrong. But there are other doctors who did say that she was essentially either seeking more narcotics than she needed or using more than she needed and not following directions and refused to deal with her. So she certainly had some basis in the medical record for that conclusion. There were some doctors who thought that she was seeking drugs more than she should have been given. That's beyond question. What isn't at all in question is that she did have the fibromyalgia, which her own treating physicians repeatedly noted was debilitating. Now, the question then becomes, if you have fibromyalgia, which is completely debilitating and excruciatingly painful, are you going to try to get more drugs to treat it? And the answer, as demonstrated in this case, is, unfortunately, yes. And you are going to be so desperate that you may even do some things that make some doctors mad. And that's what she did here. But I think that what Judge Kimmerer's major error was is she went outside the record and reached medical conclusions based on extra record evidence which are contrary to the conclusions compelled by the medical doctors. On what page are you relying for that? What finding did she make that was outside the record? I know you described it, but I'd like to see it. Where is it? I didn't. Where in the record is the finding that you say is based on extra record evidence? Let's see. I know it says that it's discussed on pages 36 through 38 of my brief. What Judge Kingrey did is she relied on the DSM-IV. That is extra record evidence. That's on 37 of my opening brief. Well, maybe when you come back, you can tell me where that is. Okay? Thank you. You've used up your time. We'll give you a minute in rebuttal. Thank you very much. Counsel. I want to mention something completely having nothing to do with the merits before I do this. All of the government's briefs that I've gotten in this case have no back cover. I am, therefore, losing all the back pages. Do you have any idea why that is? No, Your Honor. I would not know. Well, maybe you can sign it. I will make note of it, certainly. Okay. May it please the Court. What is this case? I mean, there's a whole slew of cases. I will talk to our staff. Okay. May it please the Court, my name is Mike Howard, representing the Commissioner in the case of Alexander V. Astru. Your Honor, in this case, I have two basic points I'd like to reach. The first point is that the ALJ complied with Judge Hogan's 2004 order for demanding the case. My second point I'd like to reach is that it was reasonable for the ALJ to find that plaintiff engaged in drug-seeking behavior. But that seems reasonable. The question is what is the relevance of it in terms of the fact that there was a determination. I mean, she said there was never been a proper fibromyalgia diagnosis, and she's wrong about that, isn't she? Yes, Your Honor. It was reasonable for the ALJ to, on remand, exclude fibromyalgia at Step 2 of the sequential evaluation process. Judge Hogan's remand order, I believe ---- I'm going to ask you something very specific. Oh, I'm sorry. Listen to the question. All right? The question is there was a proper 1989 diagnosis done in the way that she thought it should be done, and she says, however, that there wasn't one, ever one. So she's wrong about that. That, Your Honor, is correct. That would be a slightly inaccurate statement by the ALJ. But I would point to the ALJ's discussion of other examinations conducted later. But why should all the new doctors, later doctors who have this diagnosis, go back and do it all over again? They were operating on the understanding that she had this disease, that there was nothing they saw that was inconsistent with her having the disease. And is there some notion that every one of them has to go back and do it again? No, Your Honor. Just that when the doctors later examined plaintiff for the issue of tenderness along the spine and in the tender points, other tender points for fibromyalgia evaluation, doctors did not find tenderness corroborating the earlier finding in 1989. My understanding, my understanding was they just didn't document the right number of points because that isn't what they were doing. Your Honor, I would acknowledge that not all the doctors were conducting a full fibromyalgia evaluation where they tested each tender point. However, rheumatologist Dr. Gerber, I believe, did evaluate her for fibromyalgia specifically and Dr. Linden and Dr. Knitzberger both examined her spine, conducted a physical examination and noted no tenderness of the spine. What about Dr. Emery who identified at least 11 out of 18 tender points when diagnosing fibromyalgia and in fact identified 14? Do you disagree with that? No, Your Honor, I do not disagree. And it was, I think ideally the ALJ should have addressed that, but the ALJ did point to other evidence that was inconsistent with Dr. Emery's earlier evaluation. I would also note that even if this Court were to find that it was error for the ALJ to exclude fibromyalgia, that's step two. Backman, did any doctor find that she didn't have fibromyalgia? Look into it and say no, she doesn't have fibromyalgia. No, Your Honor, I don't believe any doctor specifically said she did not have it. However, doctors did find that she engaged in drug-seeking behavior. Well, that's true and that's why it seems to me that the question, the real question is how does that hook up with the rest of this? Your Honor, I believe it is a difficult question because we are dealing with a condition of fibromyalgia and other conditions that are not fully understood perhaps and we have this very serious credibility issue with seeking narcotic medications and secondary gain and exaggeration. I believe the ALJ reasonably accounted for that. The ALJ noted even if plaintiff has fibromyalgia, the credible limitations are accounted for in the residual functional capacity. He limited her to a modified range of light work with a sit-stand option. And if we compare that to the various opinions of treating physicians before they fired plaintiff for seeking drugs, if we look at the opinion, for instance, of Dr. Hands, he released plaintiff to engage in a job search program so long as she had a sit-stand option. And essentially I would submit that the ALJ reasonably accounted for the credible extent of fibromyalgia pain and discounted some of plaintiff's more severe or dramatic complaints by pointing to this serious credibility issue. And so it is not a question of we don't believe anything the plaintiff says. It is a question of degree. Two questions. First of all, back to the 2005 migraines. Here we did have some, as I understand it, substantial evidence of migraines up to a point in time, which the ALJ doesn't deal with as I recall. Well, Your Honor, the ALJ made, well, I'd first like to note regarding migraines, in the fact statement of plaintiff's brief, it refers to a cyst in plaintiff's brain. And while that is an unfortunate thing to happen to a person, doctors later opined that that cyst was not contributing to migraines. Right. But regarding the ALJ's evaluation of migraines, the ALJ made two important findings. The first is that migraines, as Your Honor pointed out, were controlled effectively with medication. And the ALJ cited evidence that methadone worked in 2005. Right. There's also evidence in the record that I would add to support that finding, that stated reasoning, that plaintiff admitted in 1997 that the antidepressant doxepin worked to control her migraine headaches. And the second ALJ finding essentially goes to credibility. And the ALJ points out that plaintiff engaged in drug-seeking behavior, and she referred to visits to the emergency room as evidence of drug-seeking behavior. And this is throughout the record. And regarding migraine headaches and visiting the emergency room, plaintiff went to the emergency rooms of three different hospitals and claimed to suffer from migraine headache pain, where she would receive a shot of Demerol combined with Phenergan. And Demerol is a narcotic medication scheduled to a controlled substance, which certainly supports the ALJ's finding that plaintiff was engaged in drug-seeking behavior. One other question is, I was somewhat troubled by the reliance in the ALJ opinion, the second one, on this anonymous report that this woman was getting the medication and selling it. Only because it was anonymous, and there was no corroboration of it at all that I know of. And he did repeat it several times. I mean, one does get the sense that he was somewhat swayed by it. I'm not sure how often the ALJ repeated that piece of evidence in the decision. However, I would note it is, even if this Court finds that piece of evidence to be unreliable, it is only one piece of evidence of many of drug-seeking behavior. We have essentially drug-seeking behavior. It's certainly the most disturbing. I mean, it's the one piece that would tell you that Judge Hogan's original view of the matter was that yes, she was engaging in drug-seeking behavior, but that was because she was in such pain that she really wanted, that perhaps she had become addicted to the drugs or she was overdoing the drugs. But that's one story. Another, which would not really undermine her disability claim. But the other, that is that she's getting the drugs to sell them, would certainly undermine her disability claim. And so it makes a big difference. Certainly, Your Honor. But I would submit that the anonymous caller is not the only piece of evidence that really pushes this case into the drug-seeking behavior as a credibility issue rather than consistent with pain complaints. There is the examination conducted by Dr. Cotter, which showed plaintiff exaggerating and fabricating mental symptomology. There was a note by treating physician Dr. Linden, where Dr. Linden states, and I paraphrase, I don't know why she's bringing these minor problems to my attention. She is engaging in drug-seeking behavior. And so there are many pieces of evidence that support the ALJ's finding that drug-seeking behavior was an issue of exaggeration or fabrication and indicted credibility. And it was not purely a cry for help or another way of characterizing that. Your Honor, to make my one more point I'd like to reach today is that the ALJ complied with the District Court's remand order. As we have been discussing, District Court Judge Hogan essentially left it as an open question in his remand order whether drug-seeking behavior was consistent with pain complaints or was an issue of credibility and addiction. And the ALJ complied with this remand order. She thoroughly developed the record, obtained a consultative evaluation, and held additional hearings. And given all this evidence, it was reasonable for the ALJ to find that plaintiff was not credible seeking drugs. The issue of whether that was malingering or not I believe is not dispositive. Regardless, drug-seeking behavior is a clear and convincing reason to reject a person's credibility. And for those reasons, the ALJ reasonably found she was limited to light work and rendered a partially favorable decision. And for those reasons, we request that the Court affirm the commissioner. Thank you. Thank you very much. I found the site for Judge Berzon. It's A23, where Judge Kingery goes outside the record and disagrees with the diagnosis made by the doctor. And using her own lay interpretation of the DSM, she pretty much just says that she's diagnosing malingering, even though the doctor who examined the claimant did not diagnose malingering. The doctor diagnosed possible histrionic personality traits. Totally different, because personality traits are a legitimate basis for disability. In fact, the agency has a listing. Listing 12.08 specifies that a claimant may be disabled solely on the basis of a personality disorder. And here, these personality traits of histrionics are not a proper basis to reject this claimant's testimony. What about if somebody is essentially addicted to prescription drugs that originated in pain treatment? Is that covered or not covered? Is that a reason to exclude them as being disabled? No, it isn't, Your Honor, because in Social Security ---- But it's not a basis for finding them disabled either. Well, it is, actually, because in Social Security ruling 96-7P, or I think it's 7P, it might be 8P, the agency specifies that in determining RFC, ALJ must consider side effects of medications. And if one of the side effects of a properly prescribed medication is that the claimant then becomes addicted to it, as it's apparent that that has happened here, that is not a reason to exclude disability, but rather a reason to grant disability on the basis of medication side effects. Okay. Thank you very much. Thank you. Interesting case. The case of Alexander v. Astor is submitted, and we are in recess until tomorrow. Thank you. Thank you.
judges: Farris, Nelson D. W., Berzon